2020 IL App (3d) 170794

Opinion filed October 20, 2020.
Modified upon denial of rehearing February 16, 2021.

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Bureau County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0794 Circuit No. 99-CF-47 |
| | ) | |
| RANDY L. ROYER, | ) ) | Honorable Cornelius J. Hollerich, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice McDade concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

_____

**OPINION**

¶ 1     The defendant, Randy L. Royer, appeals the second stage dismissal of his postconviction petition, arguing that his sentence is unconstitutional under the eighth amendment because the sentencing court failed to consider his youth and its attendant characteristics.

¶ 2                                I. BACKGROUND

¶ 3     The defendant was charged with one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 1998)). The indictment stated that, on August 3, 1999, the defendant struck Timothy Dildine

on the head with a baseball bat, which caused Dildine's death. The defendant was 17 years old at the time.

¶ 4    The case proceeded to a jury trial, beginning on April 19, 2000. The evidence established that Jennifer Tappen was the defendant's ex-girlfriend. They dated from February to June of 1999. During the summer of 1999, the defendant lived with Jennifer; Jennifer's father, Robert Tappen; and her brothers. Dildine would come and stay the night as well, as he was a friend of the defendant. On the night of August 2, 2000, Jennifer and Dildine went to Marquette beach around 7 p.m. They had a bonfire and went swimming. Later that evening, Robert and his girlfriend, Annette Rexroad, arrived and the four of them spent the night talking, drinking, and smoking marijuana. Eventually, Jennifer and Dildine laid a blanket on the sand and fell asleep in the morning hours of August 3.

¶ 5    While Jennifer and Dildine were at the beach, the defendant, Victor Ceballos, and a couple of other guys were drinking, smoking marijuana, and playing cards at a friend's apartment. The defendant also put "four or five hits [of acid] on his tongue" around 10 p.m. Over the course of the evening, the defendant had "[a]t least eight or nine hits of LSD." They were talking about the fact that Jennifer and Dildine were at the beach together. The entire evening the guys were needling the defendant and telling him that he should go down to the beach "and do something about it." While the guys were needling him, defendant was "pretty messed up," according to Ceballos. He was angry, crying, disoriented, had bloodshot eyes, and had trouble walking, talking, and controlling where he was moving around. A little before 6 a.m., Ceballos and the defendant went for a ride to the beach and saw Dildine's car. They stopped, and the defendant got out of the car. Ceballos did not see a bat or anything in the defendant's hand. Ceballos stayed in the car.

2

¶ 6        Rexroad left the fire and started walking away from the beach around 6 a.m. when she met the defendant. The defendant asked her where Jennifer and Dildine were, and she pointed to where they were sleeping on the beach. He had a bat in his hand. The defendant started walking toward them. Rexroad yelled for Jennifer and Dildine, but they did not hear her. The defendant walked over to where they were laying and started hitting Dildine with the bat four or five times. Rexroad started yelling and saying, "you killed him." Jennifer woke up and started yelling, and then Robert came running towards them. Jennifer woke up and saw the defendant standing over her. She did not see a baseball bat in the defendant's hands. Robert and Rexroad were screaming. Jennifer looked down and saw that she was covered in blood. Dildine was convulsing, and Jennifer noticed that his head was bleeding. Ceballos stated that the defendant was hysterical and screamed four or five times, "I killed him." He said that the defendant was shaken, crying, disoriented, trembling, had bloodshot eyes, and had trouble walking.

¶ 7        The defendant ran and got into Dildine's car. The defendant drove Dildine's car down, and the defendant and Robert put Dildine in the car. The defendant was saying that he messed up. The defendant drove Dildine to the hospital. The defendant entered the emergency room (ER) after pulling the car up in the driveway and said to a nurse, "He's dying, he needs help." The defendant appeared nervous, desperate, and "jittery." The nurse followed the defendant out to the car. When she came out to the car, she saw Dildine laying between the seats with a head wound and blood splattered all over. She stated that the defendant stood outside the car, "[l]ike a little boy that probably didn't know what he could do to help at that point and time." He shuffled from one foot to the other like he was worried. The defendant then ran away. Dildine was brought into the ER. He was in poor condition and had to be intubated.

¶ 8        Dr. Merle Piacenti testified that he was a radiologist at St. Margaret's Hospital. He was admitted as an expert in radiology. He reviewed Dildine's X-rays and stated that he had three main fractures and some small fractures in his skull. In the 20 years that he had practiced radiology, this was one of the worst skull fractures he had ever seen. Dildine died the next day from blunt force trauma to his head.

¶ 9        The defendant was cooperative with the police and confessed. He said that he had taken about nine hits of acid between 8:30 p.m. on August 2 and 4:30 a.m. on August 3. The guys were ribbing him and saying that it was not right for Jennifer to be with Dildine. He became angry when they kept teasing him about it, and he could not stop thinking about it. The defendant broke down crying during the interview, stating that he did not mean to hurt Dildine and he was sorry. After Dildine began receiving help, the defendant said he went to the Tappen residence to try to explain what he had done and why. He concluded the interview by saying that he was sorry and told the officers to tell Dildine that he was sorry because he did not know that Dildine was dying. The defendant also gave a written statement, which stated that he took nine hits of acid and "[f]rom that point on all I could think about was [Jennifer], so I started freaking out." The end of the statement said, "I got there, I went crazy, I don't know what was happening." The jury found the defendant guilty of first degree murder.

¶ 10        A presentence investigation report (PSI) indicated that the defendant had a past juvenile criminal history. In 1993, he was adjudicated a delinquent minor for committing the offenses of residential burglary, misdemeanor criminal damage to property, felony criminal damage to property, misdemeanor theft, felony theft, and misdemeanor battery. He was sentenced to a one-year term of probation. In 1994, he was adjudicated delinquent for committing the offense of reckless conduct. All prior orders were to remain in effect, and he was ordered to be placed in an

4

emergency shelter or group home out of the city of Aurora. The case was then dismissed in 1995, and he returned to the custody of his father. In 1996, he was adjudicated delinquent for committing burglary and misdemeanor criminal damage to property in Kendall County and burglary in Kane County and was sentenced to a one-year term of probation. He was found in violation of his probation for committing the offense of domestic battery, and his probation was extended. He was required to complete an intensive out-patient substance abuse program and family counseling. His probation was terminated unsuccessfully in 1998, and he was ordered to serve 30 days in the Kane County Youth Home.

¶ 11        The PSI stated that the defendant's mother was deceased. His father had two daughters from separate relationships. The defendant had attended Aurora East High School, but was referred to the Aurora Education Center, where he was enrolled for five quarters before he withdrew. He was an above-average student for the classes he completed. The defendant began using marijuana at age 11, alcohol at age 12, and cocaine and LSD at age 13. The defendant received mental health treatment on three separate occasions—in 1994, 1995, and 1998. Upon discharge in 1994, he was diagnosed with socialized conduct disorder, oppositional defiant disorder, and mixed substance abuse. In 1995, he was diagnosed with mixed substance abuse and adjustment disorder-adolescence. The defendant's treatment goals in 1998 included stabilizing his mood and behavior, promoting general functioning, dealing with stress and frustration, enhancing control over impulses, and managing his anger. Upon his discharge, he was diagnosed with polysubstance abuse disorder, alcohol abuse, and depressive disorder. His mental health evaluations characterized him as impulsive and reckless.

¶ 12        A sentencing hearing was held on August 15, 2000. Douglas Bernabei testified that he was the chief of police for the city of Spring Valley. On July 28, 1999, Francisco Rodriguez filed a

battery complaint, alleging that the defendant damaged his vehicle and struck him once in the head with a baseball bat. Jennifer had come home to the room she shared with the defendant, and the defendant noticed hickeys on her neck and Rodriguez standing outside. The defendant approached Rodriguez and asked if he was responsible for the hickeys. The defendant then hit Rodriguez and his car with the baseball bat. The defendant was charged with battery and criminal damage to property. Another individual had also stated that the defendant hit him in the head with a baseball bat in April 1999. He did not file a police report, and the defendant was never charged. The State also asked the court to consider in aggravation the evidence from trial and the PSI.

¶ 13        Debra Lynn Ward testified that she was the defendant's paternal aunt. She stated that the defendant never knew his mother as she deserted him when he was a baby. His father remarried Lisa when the defendant was two or three, and they were married for about five years. His father then married Terry for about seven years. Before and after Terry, multiple women lived with the defendant and his father. Terry and the defendant's mother ultimately died of AIDS. The defendant's father also had AIDS. Ward described the home environment as "combative." She stated that anytime she was around, the defendant's father "would be fighting a lot with the current Mrs." and the defendant would be in the middle of it. The defendant was abused; his father would hit him hard and leave bruises. The defendant grew up around a lot of drugs and alcohol and little supervision. The defendant "was pretty much on his own." Ward stated:

> "I think [the defendant] pretty much felt alone because everytime [*sic*] another, the
> first wife, when she had her own child, he kind of got shoved to the side. She pushed
> him down the steps once in anger. Then with Terry, when she met my brother, her
> kids were in foster care, and after she got them back [the defendant] was pushed
> out again, he was always the bad one out, always doing something to her kids, he

6

was the bad guy. And my brother was always fighting with Terry for years about [the defendant], *** he was always the subject of fights because her kids were more important."

¶ 14    Donald Royer testified that he was the defendant's grandfather. Every time he went to visit, his son would be drinking and would smell like marijuana. Donald testified that when the defendant was 10 years old, he climbed out of the window of the house and slept in a car in order to escape from his father.

¶ 15    The defendant gave a statement in allocution, in which he apologized to Dildine's family and said that he did not mean to hurt Dildine. He stated:

"[Dildine] was my friend. What happened wasn't supposed to happen. I have thought about it for a whole year. If I could trade places with [Dildine], I would. I never once tried to blame nobody else. I know what I did, and I know what I did was wrong. I'm sorry."

¶ 16    The State said that the defendant faced a sentence of 20 to 60 years' imprisonment. The State said there was no relative chance of rehabilitation in this case and pointed to the defendant's juvenile record and the counseling and hospitalizations that "had no effect on him." The State asked the court to sentence the defendant to the maximum 60-year sentence, noting that it believed the crime to be exceptionally brutal, heinous, and indicative of wanton cruelty. Had it not been for the United States Supreme Court's requirement that such brutal nature be proven beyond a reasonable doubt, the State said it would ask the extended term sentence of life imprisonment be imposed.

¶ 17    Defense counsel argued that the crime was not premeditated and that the defendant was "a young man who acted out of immaturity, out of lack of background and training, out of jealousy and out of drug use." Counsel stated that the defendant "had no opportunity to know anything other

7

than drugs, alcohol and an abusive family life." Counsel further noted that the defendant confessed and showed remorse.

¶ 18     The court sentenced the defendant to the maximum of 60 years' imprisonment, stating:

"In considering the sentence, the factors I find in mitigation are remorse and the youth. However, the fact that he was a young man does not mitigate in my estimation sufficiently to prevent me for sentencing him severely. The evidence here shows that violence and anger was well known and used in the family. The incident in question was done in the Court's opinion in a cold, calculated manner because he picked up a bat and went looking for someone. The factors further in aggravation are that he attacked a man that was sound asleep, with no offer or ability to defend himself. The series of blows in the Court's opinion indicate wanton cruelty to the fact that you attack a sleeping man in the nature of heinous and brutal. Considering everything, I find that the society deserves to be protected from [the defendant], given his background, almost a custom and usage of violence as a daily occurrence aggravated by drugs, two prior incidents in the same year within months of the sentence, it is the order and sentence of this Court that you are sentenced to the Illinois Department of Corrections for the term as requested by the State's Attorney of sixty years."

The court noted that the defendant would serve the entire 60-year sentence.

¶ 19     The defendant filed a motion to reconsider sentence. In denying the motion, the court stated:

"As far as the rehabilitative potential of the defendant, I was reading his [PSI], is that he had received this type of treatment through the school system or through

8

other institutions of the State of Illinois and the notation noted on it was that he was resentful of authority. So the resentful to authority when he was in rehabilitation programs, led the Court to conclude this man just does not like authority and that he is not of the type that should be in my opinion not punished to the extent that I sentenced him. The incidents immediately prior to this murder demonstrated to me is that he likes to solve problems by taking a baseball bat and swinging and hitting people. That is the type of conduct that I cannot see. That if there was rehabilitative potential that he would have been engaged in had the rehabilitative program that he was in succeeded. There was none and he demonstrated that there was no possibility of rehabilitation. Now his youthfulness and remorse, I did take into consideration, but it was insufficient in the Court's opinion not to impose a sentence that I did."

¶ 20    On direct appeal, the defendant argued, *inter alia*, that his sentence was excessive. In an unpublished order filed on April 11, 2002, this court upheld the defendant's conviction and sentence, finding that the court considered the evidence presented in mitigation, that such evidence was outweighed by the brutal and heinous nature of the murder, and that the sentence was not manifestly disproportionate to the nature of offense. *People v. Royer*, No. 3-00-0719 (2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 21    On September 28, 2015, the defendant filed a *pro se* postconviction petition, which is the subject of this appeal. Citing *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, the defendant argued that his sentence violated the eighth amendment and the proportionate penalties clause. The court advanced the petition to the second stage and appointed counsel. Counsel adopted the defendant's petition and advanced the argument. The State filed a motion to dismiss, arguing that *Miller* did not apply and the sentence was not disproportionate to the offense.

¶ 22    The case proceeded to a second-stage hearing. The court stated that the PSI contained information regarding the factors enumerated in *People v. Holman*, 2017 IL 120655, ¶ 46, so by considering the PSI, the sentencing court considered the factors. The court granted the State's motion to dismiss.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, the defendant argues that the court erred in dismissing his postconviction petition at the second stage. Specifically, he argues that his 60-year sentence is unconstitutional under the eighth amendment and the proportionate penalties clause because the sentencing court failed to consider his youth and its attendant circumstances when sentencing him to the maximum sentence.

¶ 25    The eighth amendment of the United States Constitution prohibits cruel and unusual punishment. U.S. Const., amend. VIII. It has been well established that "[w]hen the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment." *Holman*, 2017 IL 120655, ¶ 33. Therefore, "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. As our awareness of the "incompetencies associated with youth" have increased (*id.* at 477), the caselaw has continued to evolve. In 2005, the United States Supreme Court determined that the eighth amendment prohibited capital sentences for juveniles who commit murder. *Roper v. Simmons*, 543 U.S. 551, 578 (2005). This was followed by decisions in 2010 and 2012 that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 74 (2010)) and murder (*Miller*, 567 U.S. at 489). This rule espoused in *Miller* has since been held to be retroactive. *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016); *People v. Davis*, 2014 IL 115595, ¶ 39.

10

¶ 26    More recently our supreme court has considered the effects of *Miller*. In *Holman*, the court held that both mandatory and discretionary life sentences violate the eighth amendment unless the sentencing court considers as mitigation the defendant's youth and its attendant characteristics. *Holman*, 2017 IL 120655, ¶¶ 37, 40. The court stated that a juvenile defendant may still be sentenced to life imprisonment "but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. The court may only make this determination after considering the mitigating characteristics of youth, which

> "include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*

See also *id.* ¶ 44. These factors are referred to as "the *Miller* factors." *Id.* ¶ 50. Our legislature has codified these factors, and now requires that, when a person commits an offense and is under 18 years of age, the court

> "shall consider the following additional factors in mitigation in determining the appropriate sentence:

11

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the persons' family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West 2018).

¶ 27   Finally, in *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41, the court held that these prior holdings also applied to *de facto* life sentences, which included sentences greater than 40 years. The court stated that, in order to prevail on a claim under this line of cases, a defendant who committed the offense while a juvenile must show (1) the defendant was subject to a life sentence, whether mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics, as set forth in *Holman*. *Id.* ¶ 27.

¶ 28   There is no dispute that the defendant's 60-year sentence constitutes a *de facto* life sentence under *Buffer*. Therefore, we turn to the question of whether the sentencing court properly considered the defendant's youth and its attendant characteristics.

¶ 29   *Holman* does not solely require the court to "consider specifically" the *Miller* factors (*Holman*, 2017 IL 120655, ¶¶ 43, 46), but requires the court to consider them as *mitigation*. See *id.* ¶¶ 37, 44-45; see also 730 ILCS 5/5-4.5-105 (West 2018). We cannot say that the court did so. Here, when sentencing the defendant, the court stated:

> "In considering the sentence, the factors I find in mitigation are remorse and the youth. However, the fact that he was a young man does not mitigate in my estimation sufficiently to prevent me for sentencing him severely. The evidence here shows that violence and anger was well known and used in the family. The incident in question was done in the Court's opinion in a cold, calculated manner because he picked up a bat and went looking for someone. The factors further in aggravation are that he attacked a man that was sound asleep, with no offer or ability to defend himself. The series of blows in the Court's opinion indicate wanton cruelty to the fact that you attack a sleeping man in the nature of heinous and brutal."

13

The court stated that it found remorse and youth as mitigation, stating that it did not provide enough mitigation to prevent a severe sentence considering the aggravating evidence. The court then moved on to discuss the aggravating circumstances, including the violent, angry home environment the defendant grew up in. The court thus specifically considered one of the *Miller* factors, the defendant's family and home environment, as aggravation instead of mitigation. This directly contradicts the edict of *Miller* and its progeny that the court consider these characteristics of youth as mitigation. Though the court may have had evidence relating to the rest of the *Miller* factors, we cannot say that it considered the evidence as mitigation, particularly where it did not explicitly mention it, other than his rehabilitative potential, and where it considered one of the factors as aggravation.

¶ 30    Even accepting the State's contention that the court's comments do not show that it considered the defendant's family and home environment as aggravation, we find that merely having evidence of the *Miller* factors before the court is not enough to show that the court considered it in mitigation. In *Buffer*, the court concluded that the sentencing court had failed to consider the defendant's youth and its attendant characteristics in imposing the sentence. *Buffer*, 2019 IL 122327, ¶ 42. During sentencing, the court had stated that it considered the evidence at trial, the seriousness of the offense, the PSI, the financial impact of incarceration, the defendant's age and lack of dependents, the evidence in aggravation and mitigation, his substance abuse issues and treatment, the potential for rehabilitation, the possibility of alternative sentencing, the statement in allocution, the victim impact statement, and all relevant and reliable hearsay from the sentencing hearing. *Id.* ¶ 5. Nonetheless, the supreme court stated that "the record [did] not indicate that the court considered defendant's youth and its attendant characteristics." *Id.* ¶ 46. Based on this, other courts have found that the mere awareness of the defendant's age and consideration of

14

the evidence that was presented does not show that the court specifically considered the *Miller* factors as mitigating evidence. See *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 24; *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 25; *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13.

¶ 31    In this case, it is clear that the proceedings at trial and sentencing and the PSI all developed evidence of the various factors, including, for example, prior mental health evaluations characterizing the defendant as impulsive and reckless, encouragement from his peers to "do something" about Dildine and Jennifer, and the history of abuse and neglect the defendant received at home. The mere inclusion of this information in the evidence before the court was not enough to show that it considered it in mitigation.

¶ 32    In coming to this conclusion, we reject the State's reliance on *People v. Walker*, 2018 IL App (3d) 140723-B, and *Holman*, 2017 IL 120655, for the proposition that the evidence presented at sentencing was sufficient to show that the court considered the defendant's youth and its attendant characteristics. In *Walker*, this court stated that, where the sentencing hearing transcripts and PSI provided information regarding the defendant's age and life circumstances, "there [was] no reasonable possibility that the trial court, during defendant's sentencing hearing, was unaware of, or failed to consider, the fact that defendant was 17 years old with a grossly unstable living environment when he committed murder." *Walker*, 2018 IL App (3d) 140723-B, ¶¶ 23-24. The court in *Holman* found that the evidence presented to the court was considered and passed constitutional muster under *Miller*. *Holman*, 2017 IL 120655, ¶¶ 48-50. First, both *Walker* and *Holman* were decided before our supreme court decided *Buffer*, where, as stated above (*supra* ¶ 30), the mere inclusion of such information as evidence at sentencing was not enough. *Buffer*, 2019 IL 122327, ¶ 46. Second, unlike the sentencing court here, there was no evidence in *Walker* and *Holman* that the court may have considered one of the *Miller* factors as aggravation instead of

15

mitigation. Third, *Holman* is factually distinguishable, where the defendant told his attorney not to offer any mitigating evidence and the supreme court specifically found that none of the *Miller* factors were present to mitigate the defendant's sentence. *Holman*, 2017 IL 120655, ¶¶ 48-50.

¶ 33    Two days after this opinion was filed, our supreme court issued its decision in *People v. Lusby*, 2020 IL 124046. The State filed a petition for rehearing, arguing that *Lusby* warrants a different analysis and conclusion in this case. We disagree. *Lusby* did not change the framework for considering *Miller* claims, but instead applied the existing framework to the facts of the case. We find *Lusby* factually distinguishable from this case. As stated above, (*supra* ¶ 29) here the trial court incorrectly considered one of the mitigating *Miller* factors as aggravating evidence, which did not happen in *Lusby*. Moreover, the PSI and evidence presented before the trial court in *Lusby* did not show any of the *Miller* factors. *Lusby*, 2020 IL 124046, ¶¶ 11-12. The evidence showed that the defendant had an extensive criminal history. *Id.* ¶ 13. He raped the victim (who was a stranger), cut her throat while she was still alive, and then shot her in the head. *Id.* ¶¶ 4, 8. The defendant in *Lusby* did not present any evidence at sentencing, a fact mentioned three times in the opinion. *Id.* ¶¶ 15, 48, 52. In fact, defense counsel's only argument was that the court should consider the defendant's young age. *Id.* ¶ 17. Here, the PSI showed extensive evidence of the *Miller* factors. *Supra* ¶¶ 10-11. The defendant also presented two witnesses at the sentencing hearing that spoke about the defendant's abusive childhood and tough home life. *Supra* ¶¶ 13-14. We do not believe that the record shows that the court considered this evidence in mitigation as necessary under *Miller* and its progeny, and *Lusby* does not change this. Thus, we deny the State's petition for rehearing.

¶ 34    Because the sentencing court failed to consider the defendant's youth and its attendant characteristics as mitigation, his sentence violates the eighth amendment. See *Buffer*, 2019 IL

16

122327, ¶ 46. While the defendant's postconviction petition was dismissed at the second stage, "the proper remedy is to vacate defendant's sentence and to remand for a new sentencing hearing." *Id.* ¶ 47. On remand, the defendant "is entitled *** to be sentenced under the scheme prescribed by section 5-4.5-105 of the Unified Code of Corrections." *Id.*; 730 ILCS 5/5-4.5-105 (West 2018). As we grant relief on this issue, we do not consider the defendant's alternative argument.

¶ 35                                III. CONCLUSION

¶ 36        The judgment of the circuit court of Bureau County is reversed and remanded.

¶ 37        Reversed and remanded.

¶ 38        JUSTICE SCHMIDT, dissenting:

¶ 39        The majority finds defendant's *de facto* life sentence unconstitutional under the eighth amendment. According to the majority, the sentencing court failed to properly consider his youth and its attendant circumstances as mitigating factors as required by *Miller* and its progeny. I disagree. The sentencing court received and considered evidence of defendant's youth and its attendant circumstances at the sentencing hearing. Accordingly, I would find the discretionary *de facto* life sentence defendant received constitutional under *Miller*.

¶ 40        In *Holman*, our supreme court explained that a discretionary life sentence for a juvenile offender is constitutional so long as the sentencing court considered defendant's youth and its attendant circumstances at sentencing.

¶ 41        "Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile

17

defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. [Citation.]" *Holman*, 2017 IL 120655, ¶ 46.

¶ 42     These factors were codified by our legislature. See 730 ILCS 5/5-4.5-105 (West 2018).

¶ 43     The record in this case shows that defendant's youth and its attendant circumstances were detailed at length and considered by the trial court at the sentencing hearing. In fact, the bulk of the defense's argument centered around defendant's age. The defense also argued that defendant acted out of impulsivity and immaturity. The PSI contained a detailed history of defendant's youthful characteristics and his home life. The PSI described defendant as an excellent student, having prior mental health problems, and having twice assaulted another person with a baseball bat. In both instances, defendant assaulted the other person based on their relationships with Tappan. Defendant's criminal history showed that defendant lacked any rehabilitative potential. In 1993, defendant was adjudicated delinquent for residential burglary, felony theft, misdemeanor theft, and battery. Five months later, the State filed a petition to revoke defendant's probation. Defendant admitted to the allegations in the petition that he committed reckless conduct. In 1996, defendant was found delinquent again after he was charged with burglary and criminal damage to property. The same year, defendant was found delinquent again for committing burglary. Four months after that, defendant's probation was revoked for committing domestic battery.

¶ 44     Additionally, the sentencing hearing revealed that defendant's mother abandoned him at a young age. Defendant's father abused drugs, and drug use was prevalent in the family.

18

Defendant also received mental health treatment on three occasions. Defendant received diagnosis for conduct disorder, oppositional defiant disorder, mixed substance abuse, adjustment disorder, polysubstance abuse disorder, alcohol abuse, and depressive disorder. Although defendant received mental health treatment in the past, there is no evidence that defendant was incompetent, unable to deal with police or prosecutors, or unable to assist his attorney.

¶ 45        After hearing the evidence at trial and sentencing, as well as the arguments of the prosecution and defense, the sentencing court found that defendant's youth and remorse were mitigating factors, but it found that these factors were insufficient to prevent it from imposing a severe sentence. The court rejected the notion that defendant committed the crime out of impulsivity. Instead, the court found that defendant committed the murder "in a cold, calculated manner because [defendant] picked up a bat and went looking for [the victim.]" What is more, this court rejected defendant's claim that the sentencing court failed to properly consider his youth and potential for rehabilitation as mitigating factors. *People v. Royer*, No. 3-00-0719 (2002) (unpublished order under Illinois Supreme Court Rule 23). The fact that *Miller* was decided after the direct appeal does not mean this court's conclusion is wrong.

¶ 46        Moreover, in *Holman*, our supreme court recognized that "a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Defendant here did not act out of impulsivity. To the contrary, defendant murdered the victim in a cold, calculated, and premeditated manner. He got upset. He continued to drink and take drugs with his friends throughout night. Then, in the early morning, he took a baseball bat, sought out the victim, found the victim asleep, and beat him over the head with the baseball bat. The victim

later died from injuries that one doctor described as the worst he had ever seen. In fact, this court found that "[t]he offense was clearly brutal and heinous given the evidence that defendant attacked [the victim] while he was sleeping, repeatedly struck him with a baseball bat and inflicted injuries of a severity rarely seen by the medical professionals who testified." *Royer*, No. 3-00-0719. Defendant's conduct showed irretrievable depravity, permanent incorrigibility, and irreparable corruption beyond the possibility of rehabilitation. Further, it is clear from defendant's repeated criminal behavior that he had a complete disregard and disrespect for the punishments he already received. He had no rehabilitative potential. The trial court's sentencing passes the constitutional requirements of *Miller*.

¶ 47        The majority insists that the sentencing court improperly considered defendant's violent, angry home environment as a factor in aggravation. The majority misapprehends the trial court's statement. The statement in question is:

¶ 48    "In considering the sentence, the factors I find in mitigation are remorse and the youth. However, the fact that he was a young man does not mitigate in my estimation sufficiently to prevent me for sentencing him severely. The evidence here shows that violence and anger was well known and used in the family. The incident in question was done in the Court's opinion in a cold, calculated manner because he picked up a bat and went looking for someone. The factors further in aggravation are that he attacked a man that was sound asleep, with no offer or no ability to defend himself. The series of blows in the Court's opinion indicate wanton cruelty in the fact that you attack a sleeping man in the nature of heinous and brutal."

¶ 49    Contrary to the majority's interpretation, the sentencing court's statement does not show that it considered defendant's home life in aggravation. The court's comment about defendant's home life came immediately after it explained that it had considered defendant's youth as a mitigating

20

factor. In other words, the court merely mentioned that defendant's home life and environment did not mitigate enough to prevent the court from imposing a severe sentence. In any event, the sentencing court never stated that it considered defendant's home environment as an aggravating factor. Instead, the court limited its discussion of aggravating factors to defendant's lack of rehabilitative potential and the cold, calculated manner in which he murdered the victim. The court did not improperly consider defendant's home environment as an aggravating factor.

¶ 50    The State filed a petition for rehearing in light of our supreme court's recent decision in *People v. Lusby*, 2020 IL 124046. The majority finds that *Lusby* does not change the outcome in this case. Contrary to the majority's opinion, *Lusby* further supports the conclusion that defendant here received a sentencing hearing that comports with *Miller*. As stated in *Lusby*, review of the sentencing proceedings is "to ensure that the trial court made an informed decision based on the totality of the circumstances that the defendant was incorrigible and a life sentence was appropriate." *Lusby*, 2020 IL 124046, ¶ 35. To that end, the sentencing court is not required to comment on each of the factors in mitigation and aggravation.

¶ 51    Here, the sentencing court stated that it considered "everything" in fashioning defendant's sentence. The PSI included a detailed discussion of defendant's youth and the relevant attendant circumstances. The court explicitly noted defendant's remorse and youth as mitigation. However, the court found that it did not provide sufficient mitigation to prevent a severe sentence considering the aggravating evidence. Similarly, the sentencing court in *Lusby* commented that defendant's age was a factor. *Id.* ¶ 39. That court acknowledged that defendant committed the offenses at a young age and that youthful decisions can be in very poor judgment, but the court concluded that defendant's conduct could not be considered minor. *Id.* The trial court's consideration of defendant's youth in this case is no different than the trial court's

consideration in *Lusby*. Consequently, the trial court in this case made a sufficient consideration of defendant's youth and its attendant circumstances when it sentenced defendant. Rehearing should be granted, and the trial court's decision should be affirmed.

¶ 52        As I would find defendant's sentence constitutional, I must address defendant's alternative argument that the truth-in-sentencing statute, section 3-6-3(a)(2)(i) of the Unified Code of Corrections (Code) (730 ILCS 5/3-6-3(a)(2)(i) (West 2000)), which requires him to serve his entire sentence without the possibility of parole, violates the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11). Defendant argues that this provision of the Code is unconstitutional as applied to him and similarly situated juvenile defendants.

¶ 53        The Illinois Supreme Court has held that the proportionate penalties clause is "co-extensive with the eighth amendment's cruel and unusual punishment clause." *People v. Patterson*, 2014 IL 115102, ¶ 106 (citing *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006)). Therefore, if defendant fails to demonstrate an eighth amendment violation, his proportionate penalties claim must also fail.

¶ 54        Defendant claims that the truth-in-sentencing statute is unconstitutional based on a newly enacted juvenile sentencing statute. Generally, this new law provides that defendants under the age of 21 at the time they committed first degree murder are eligible for parole review after serving 20 years of their sentence. 730 ILCS 5/5-4.5-110 (West 2018). This statute applies to sentencing hearings on or after June 1, 2019. Defendant's sentencing hearing occurred well before the new statute became effective. Consequently, he is ineligible for parole hearings. According to defendant, this new change in the law demonstrates that the truth-in-sentencing statute, which requires him to serve 100% of his *de facto* life sentence, violates the proportionate penalties clause. Because the Illinois Supreme Court and the United States Supreme Court have

22

both found that a juvenile life sentence does not violate a defendant's eight amendment rights, I would find the truth-in-sentencing statute is constitutional as applied to defendant under the proportionate penalties clause.

¶ 55　　The Illinois Supreme Court and the United States Supreme Court have already held that, under the eighth amendment, a juvenile may be sentenced to life imprisonment so long as the sentence is discretionary, and the court had the opportunity to consider defendant's youth in mitigation. *Miller*, 567 U.S. at 489; *Buffer*, 2019 IL 122327, ¶ 24; *Holman*, 2017 IL 120655, ¶ 40; *People v. Reyes*, 2016 IL 119271, ¶ 9. To the extent that *Miller* requires the trial court to consider the juvenile's age at the time of the event, that requirement was satisfied here. As discussed above, the trial court considered the *Miller* factors at sentencing. No violation of defendant's eight amendment occurred. Therefore, his proportionate penalties claim also fails.

¶ 56　　Even though our legislature chose to enact the new law allowing certain juvenile offenders to receive parole hearings after 20 years of imprisonment, the statute did not create a new constitutional right. The statute explicitly requires such hearings for offenders sentenced after June 1, 2019. Had the legislature intended to create a broad rule to allow offenders like defendant to have the opportunity to receive a parole hearing, the legislature would not have included an effective date. Simply because the legislature created a new rule for sentencing juvenile defendants does not change the fact that discretionary life sentences have been held constitutional. Again, this statute does not change the longstanding law holding that juvenile offenders may be sentenced to a discretionary life sentence.

¶ 57　　I would affirm the trial court.

23

**No. 3-17-0794**

| | |
|---|---|
| **Cite as:** | *People v. Royer*, 2020 IL App (3d) 170794 |
| **Decision Under Review:** | Appeal from the Circuit Court of Bureau County, No. 99-CF-47; the Hon. Cornelius J. Hollerich, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Steven Varel, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Geno Caffarini, State's Attorney, of Princeton (Patrick Delfino and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |