2023 IL App (2d) 220182-U
No. 2-22-0182
Order filed May 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-3323 |
| JUSTIN CAVAZOS, | ) ) ) | Honorable Donald Tegeler, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court's application of sentencing factors did not constitute plain error, nor did the court abuse its discretion in applying a firearm enhancement. Affirmed.

¶ 2    On January 20, 2007, 15-year-old Oscar Rodriguez and his girlfriend, Claudia Lozano, were walking along High Street near Grove Street in Aurora. Gunshots were fired from a passing sports utility vehicle (SUV), killing Rodriguez and injuring Lozano. Defendant, Justin Cavazos (age 16 when the shooting occurred), and his brother, Joshua Cavazos (age 17 when the shooting occurred), were charged in connection with the incident.

¶ 3    In 2011, the brothers were tried simultaneously (in adult court) by separate juries. Defendant's jury convicted him of two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2006)), attempt first-degree murder (720 ILCS 5/8-4(a), 5/9-1(a)(1) (West 2006)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)).  Further, as to the first-degree murder and attempt murder convictions, the jury found that defendant, or one for whose conduct he was responsible, committed the crimes while armed with a firearm, thus, subjecting him to mandatory sentencing enhancements (730 ILCS 5/5-8-1(a)(1)(d) (West 2006)).  The trial court denied defendant's posttrial motions and sentenced him to an aggregate of 60 years' imprisonment.

¶ 4    On appeal, this court rejected defendant's arguments concerning the admissibility of subsequent bad act evidence and gang expert testimony, as well as the constitutionality of his sentence. *People v. Cavazos*, 2015 IL App (2d) 120444.  Later, the case returned to us following our supreme court's entry of a supervisory order, directing us to vacate our prior judgment, consider the effect of *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constituted an unconstitutional *de facto* life sentence, and to determine if a different result was warranted. *People v. Cavazos*, No. 119139 (Ill. Nov. 24, 2021) (supervisory order).  However, defendant also filed an unopposed motion, asking that we dismiss as moot his sentencing argument, as the State had agreed in postconviction proceedings that he should receive a new sentencing hearing.  Accordingly, we affirmed defendant's conviction and dismissed as moot his sentencing arguments. *People v. Cavazos*, 2022 IL App (2d) 120444-B.

¶ 5    On March 18, 2022, defendant received a new sentencing hearing, and the trial court imposed a 41-year aggregate sentence.  The court denied defendant's motion to reconsider, and defendant appeals.  For the following reasons, we affirm.

¶ 6                                    I. BACKGROUND

¶ 7                                     A.  Trial

¶ 8      Detailed facts concerning the trial proceedings were set forth in *Cavazos*, 2022 IL App (2d) 120444-B, ¶¶ 5-60.  For context, however, we summarize that, on January 20, 2007, defendant and Joshua Cavazos, both members of the Insane Deuces street gang, were in Aurora at another gang member's apartment, where gang-owned firearms, known as "nation guns," were stored and available for any gang member to use when "hunting" for rival gang members to shoot.  Joshua wanted to go shoot someone; defendant showed off that he had a gun.  Defendant, Joshua, and two other gang members then went "hunting" in a stolen SUV, and defendant brought the gun.  Joshua, the shooter, sat in the SUV's front passenger seat, while defendant sat in the rear driver's-side seat. They saw Rodriguez and Lozano walking along High Street.  Defendant engaged in "false flagging," *i.e.*, throwing the rival gang's signs and yelling rival gang slogans, and Rodriguez "represented" by throwing up the Latin Kings crown.  Defendant then gave the other backseat passenger, David Hernandez, the gun.  Hernandez refused to shoot and  passed the gun back to defendant, who then passed the weapon to Joshua.  Joshua fired four gunshots, killing Rodriguez and injuring Lozano.

¶ 9      As noted, defendant and Joshua were charged in connection with the incident.[1]  The jury convicted defendant, on an accountability theory, of first-degree murder, attempted first-degree

_____

[1]Joshua was resentenced to 50 years' imprisonment, and his appeal is before us in *People v. Cavazos*, 2023 IL App (2d) 220066.  Hernandez made a deal with the State and, in exchange for his testimony, accepted a 5-year sentence for possession of a stolen motor vehicle, with a possibility of bootcamp, and the State dropped 12 pending misdemeanor charges against him.  In

murder, both while armed with a firearm, as well as aggravated discharge of a firearm and unlawful possession of a stolen motor vehicle. The court denied defendant's motion for a new trial.

¶ 10                                    B. First Sentencing Hearing

¶ 11    At defendant's first sentencing hearing, the trial court, Judge Timothy Sheldon presiding, reviewed its "170 pages of notes" from trial, the presentence report, "which because of [defendant]'s age has mostly his juvenile record," the financial impact of incarceration, and the aggravating and mitigating evidence. It noted that it did not find "any factors in mitigation worthy of comment," but without explanation found three aggravating factors applicable, namely, defendant had a history of prior criminal activity, the need for deterrence, and that the crime involved an organized gang. The court sentenced defendant to 20 years' imprisonment for first-degree murder (see 730 ILCS 5-4.5-20(a)(1) (West 2006) (providing range of 20 to 60 years)), with a firearm add-on of 15 years (see 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006)). For attempt first-degree murder, the court sentenced defendant to 10 years' imprisonment (see 730 ILCS 5/5-4.5-25(a) (West 2006) (providing range of 6 to 30 years)), with a firearm add-on of 15 years. The murder and attempt-murder sentences were to be served consecutively (see 730 ILCS 5/5-8-4(d)(1) (West 2006)). Finally, the court sentenced defendant to five years' imprisonment for possession of a stolen motor vehicle (see 730 ILCS 5/5-4.5-35(a) (West 2006) (providing range of three to

_____

exchange for his testimony, the fourth occupant and driver, Jaime Barragan, age 21 at the time, pleaded guilty to attempted armed violence and aggravated battery on a public way for an 18-year aggregate sentence to be served at 50 percent, and the State assisted in his attempts to avoid deportation. See *Cavazos*, 2015 IL App (2d) 120444, ¶¶ 21, 31.

seven years)), to run concurrent to the attempt-murder sentence. The sentence totaled 60 years' imprisonment.

¶ 12   Defendant moved the court to reconsider the sentence, particularly in light of his age and the fact that he was not the shooter. He asked that the court reduce the sentences for attempt murder and possession of a stolen motor vehicle to their respective minimums. The court denied defendant's motion, noting that it had given the sentence a great deal of thought and that it had tried to make the sentence close to that received by his brother, Joshua (which, at that time, totaled 75 years' imprisonment (20 years for murder with a 25-year add-on, 10 years for attempt murder with a 20-year add-on, and 3 years for possession of a stolen motor vehicle)).

¶ 13                     C.  Second Sentencing Hearing

¶ 14   As previously noted, on appeal, this court affirmed defendant's sentence and, ultimately, found moot his sentencing arguments because the State had agreed that defendant should receive a new sentencing hearing. *Cavazos*, 2022 IL App (2d) 120444-B.

¶ 15   On March 18, 2022, a second sentencing hearing occurred before Judge Donald J. Tegeler (the original sentencing judge, Timothy Sheldon, retired).

¶ 16   Defendant submitted a group exhibit of mitigation letters in his support, a group exhibit of certificates of achievement and participation in education programs, and an academic paper concerning juvenile development for sentencing purposes. In part, this evidence reflected that defendant was one of 20 students, out of more than 100 applicants, accepted into Northwestern University through its "highly competitive" Prison Education Program. He had received his associate's degree, and completion of his bachelor's degree was anticipated in spring 2023. Defendant presented numerous letters of support from Northwestern professors and graduate students, commenting favorably on his work ethic, abilities, and personality.

¶ 17    In addition, defendant presented the curriculum vitae and evaluation report from James Garbarino, a psychologist and child and adolescent development consultant. Garbarino opined that defendant had experienced many of the "classic toxic influences associated with psychological damage in childhood," including violent trauma in his family and social alienation as a teen. Many of those experiences occurred before age 14, when "everything feels more intense," which helps to explain the "enormous developmental challenge" defendant faced as he turned age 16. Garbarino noted that, on an "Adverse Experiences Test," defendant received a score worse than 97% of American children, having reported that he experienced as a child physical and emotional abuse and neglect, parental separation, and witnessed domestic violence. According to Garbarino, the family trauma and disruption defendant experienced at home "knocked him off course developmentally." The circumstances of defendant's youth and the neighborhood in which he lived contributed to defendant's "war zone mentality," which included an extreme sensitivity to threats and a high probability of responding to threats with aggression. Garbarino noted that defendant witnessed several violent traumatic events as a child, including when, around age five or six, the windows of his home were shot out by gunfire; at age seven, he was shot by gang crossfire when he was playing in a park; and, as a teenager while leaving high school, he was shot at and ran behind bushes to hide. Defendant received no psychological intervention to deal with any of these traumas in his youth. Ultimately, Garbarino opined, however, that defendant had matured since the offense, his adult education, reflection, and spiritual growth worked to understand and overcome the "war zone mentality," and his development had taken a "decidedly positive direction" in adulthood. Garabino opined that, at age 31, defendant has had at least 6 years of maturity to work on his issues (given that maturity is presumed at age 25), and he had demonstrated growth and resilience. In short, Garbarino concluded that defendant was not

"irreparably corrupt" and was "well positioned developmentally and socially to make the transition from prison to success in the outside world."

¶ 18    Defendant's stepfather, Mike Loken, testified that he owns a carpentry business. For around 40 days, defendant lived with Loken and defendant's mother prior to his arrest in this case. During that short time, defendant was preparing for junior college and worked for Loken. Loken testified that defendant worked hard and that his performance was "very good." Loken speaks to defendant around four or five times each month, and defendant also speaks with his mother multiple times weekly and his father a few times monthly. According to Loken, since defendant has been in custody, he has completely changed, as he is looking toward his future, trying to get his life back on track, and working on his education. In addition, Loken has seen other signs of maturity, such as defendant's efforts to connect with the family through communication with his mother and sending cards to his nieces. When defendant is released from prison, Loken "definitely" will allow him to live with him, his wife, and defendant's nieces and hopes that he will work for the family business. In addition, "I'm pretty sure he's going to continue to keep going to school. He loves the school. He loves the people he's working with from Northwestern."

¶ 19    Defendant made a statement in allocution. In part, he apologized to the victims and their families, recognizing that "sorry" was inadequate. He apologized to his own family, including Joshua, for putting them through the painful situation, and he recognized that his mother tried to keep him out of trouble. Defendant explained that, while it may be hard to understand why someone would join a gang, it was the environment that surrounded, shaped, and influenced him. He noted that, when he was shot in a park during gang crossfire as a child, no one discussed with him why the shootings occurred, that it was wrong for someone to shoot him, he received no counseling, and he simply had to put it behind him. He grew up angry. Nonetheless, defendant

expressed that, while incarcerated and facing 60 years with no incentive to do better, "I did just that. I did better. I wanted to show my mom that I could become something better, I could still make use of my life in some significant way." Defendant noted that he has tried to be productive in every type of way, is in control of his life now, has no gang ideology or mindset, and committed the crime when he was young; "I'm a different person now."

¶ 20     The State presented transcripts from the prior proceedings, as well as an arrest warrant and indictment against defendant for an attempt first-degree murder (the subject of other-crimes evidence introduced at trial) that was later *nolle prossed*. In addition, it presented four impact statements from Rodriguez's family.

¶ 21     The State represented to the court that it was cognizant and mindful of defendant's attempts to rehabilitate himself while incarcerated, but reiterated that defendant was an active participant in the offenses, that he should have "known better," given that he was shot by gang crossfire at age seven, and "[h]e can't wipe the slate clean, Judge, by the fact that he's improving himself." It asked the court to send defendant and other juveniles a message and to impose a 41-year aggregate sentence.

¶ 22     Defendant responded that he was not asking for the court to wipe the slate clean. "That's impossible." However, defendant asked the court to consider the new scientific understanding that has developed concerning juvenile brain development, the caselaw that has evolved concerning it, and the mitigating factors in section 4-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2020)) that apply to young offenders. Going through those factors, defense counsel emphasized, in part, that research reflects that juveniles focus on immediacy, not the consequences of their actions, that defendant grew up in a "war zone" gang environment, and that he had both family members that were high ranking gang members and an absent father.

Counsel emphasized the certificates of participation and achievement defendant had earned, as well as the letters, including individuals at Northwestern University, reflecting how hard defendant works and his efforts to help other students. "This is actual college that he's earned an associate's degree. He's already earned his GED, the associate's degree. The bachelor's degree is next, which I believe will be next earned next year ***. But that is proof of his potential rehabilitation." Despite the 60-year sentence he originally received, defendant dedicated himself to his education. Counsel noted that, as far as deterrence is concerned, science does not support deterrence applicability for juveniles, because they "don't control their environment. They don't control the biology of their brain. It's not the same thing [as an adult] where they made their bed and they lie in it. Their choices are based on things that adults do not base their choices on. While yes, they should be held accountable, but not on the same level as adults." Given his rehabilitation, and in consideration of all factors in mitigation and aggravation, defense counsel asked that the court impose the minimum sentence. "He is being punished. He was 16 at the time of this. *** The minimum amount is 26 years. That's obviously more time than he was alive when this offense occurred. He is being punished."

¶ 23    The court noted that it had reviewed all transcripts, evidence, and exhibits submitted by the parties, as well as the transcripts and relevant decisions in Joshua's case. It adopted Judge Sheldon's prior findings related to aggravation and mitigation and considered the factors in section 4-4.5-105 of the Code as they relate to defendant. The court imposed the State's 41-year recommended sentence, including 20 years for first-degree murder and 21 years overall for attempt murder, comprised of 6 years for the underlying offense and a 15-year firearm enhancement.[2]

_____

[2]The court noted its sentence did not violate *Miller v. Alabama*, 567 U.S. 460, 489 (2012)

¶ 24    In announcing its sentence, the court found that defendant did not have a significant criminal history before his incarceration. It noted that he had only "very minor" disciplinary records while in custody and that, despite being the victim of a violent attack in prison, he had not let anger and hatred ruin him and had remained a "model prisoner." Further, the court commented:

> "I've heard a lot of arguments today. And I disagree with some. I agree with a lot of what is said about juveniles. I agree that juveniles don't have the mental capacity of adults. But I also agree that a juvenile the age of [defendant] based upon his background knew exactly what a gun was, knew exactly what a gun could do, and knew what he expected that gun to do when he handed it to his brother. He may not be the one who shot but that's why he's found guilty is because I believe he did know."

¶ 25    Further, the court recognized that some people in defendant's family were gang members and, given the area in which defendant grew up, it would have been a "tough, tough, tough proposition" not to join a gang. "I don't suggest it's an easy decision to make[,] especially with a juvenile mind. But a juvenile mind still knows right from wrong." The court reiterated that Rodriguez did not deserve to be killed, even if he flashed a gang sign, and that the court did not

---

(holding a juvenile may not be sentenced to life without parole without a consideration of youth and its attendant circumstances), or its progeny, because actual time served would be less than 40 years. See, *e.g.*, *People v. Buffer*, 2019 IL 122327, ¶ 40; *People v. Dorsey*, 2021 IL 123010. It also noted that it could also probably sentence defendant to a much greater term without violating *Miller* because defendant was now eligible for parole under the new parole statute. See 730 ILCS 5/5-4.5-115(b) (West 2020) (allowing a juvenile defendant to apply for parole upon serving 20 years of a sentence).

know what was going through the heads of individuals who made a decision to go find someone to shoot. It continued:

"And, you know, at some point it's going to get across to these gangs that if that's the way to rise up in the gang, guess what, every one of them almost ends up dead or in jail for a significant period of time. And by the time they're 30, their life is over. The person they shot and killed [*sic*] life is over. And the person who did the shooting almost always gets caught or ends up dead themselves. That's not the way to live. That message has to get out to people who are 10 and people who are 30 and people who are 40.

In this case at the age of 7, [defendant] was playing and rival gang members—and I don't think [defendant] is in a gang at 7—came up and shot him. He knows what it's like to be shot. He knows the trauma that occurs when somebody is shot. He lived. I suppose unfortunately for [Rodriguez] because if [defendant] sitting here hadn't given his brother the gun, Mr. [Rodriguez] may be alive."

¶ 26   Similarly, the court noted that, when defendant was 12 years old, his uncle was murdered and, so, defendant knew what it was like to lose a loved one, yet he still handed the gun to his brother. "Yeah, there's some impetuosity, but knowing what you're trying to do is take away a loved one from somebody else." Despite defendant's mom trying to send him away to another school to get away from gangs, defendant did not, according to the court, "want to."

¶ 27    The court further noted that, when defendant was stabbed in prison by his cellmate, he met with a therapist for months in order to process the stabbing and spent two or three years trying to understand why, when he thought he had a good relationship with his cellmate, it occurred. Yet this is something that Rodriguez never got to do, and his family will forever be trying to understand and process why, when he was just minding his own business, he was killed. "[Defendant] sitting

here knows why it occurred. He knows what his thought process was, whether they're impetuous or not."

¶ 28 The court commented that, if it had been sentencing defendant originally, it would have imposed more time than Judge Sheldon did and, in that respect, defendant was very fortunate that Judge Sheldon was the sentencing judge. The court recognized defendant's efforts at rehabilitation, commending him for trying to make something of himself while in custody and noting it gave "a lot of credit for what you've done in custody." Further, it found that defendant was not "the most depraved individual." It also agreed with defendant that many people in the Department of Corrections lose faith, as well as contact with their families, and it commended defendant for not losing either. The court commented that defendant had a strong family and that Loken obviously had a lot of character and love for his family. The court agreed it had to take into account defendant's "very strong" and "very great" rehabilitative potential, "but you also have to pay your debt for what you did."

¶ 29 The court then commented on Rodriguez and his potential, as gleaned from the victim-impact letters:

"[Rodriguez] had a lot of potential, as I understand. I've read the letters. [Rodriguez] played a sport that I love dearly. I played throughout high school and college. I was fortunate to play soccer until I got too old. I got to get old. I'll be upfront, I was a good soccer player but I was never invited to go out to California and play at the age of 15. Many of us get to get old and the retirement is forced on us to play games because our body doesn't let us do it anymore. [Rodriguez] didn't get that chance."

¶ 30 The court noted that, in its discretion and because defendant was a juvenile when he committed the offense, he would not increase the sentence on the original murder charge and would

not impose the firearm enhancement on that charge. As to attempt murder, for which defendant had originally received a 10-year sentence on the underlying offense, the court noted that both the State and defense were requesting the minimum and, because there existed ample evidence about defendant's rehabilitative potential and his behavior while in custody, it would impose instead a 6-year sentence for the underlying offense. However, it found appropriate the 15-year firearm add-on for that conviction because this case would not have occurred if defendant had not handed over a gun, and the add-on was created because the legislature wanted to avoid people dying from guns, "Too easy. Too quick. People don't think." Finally, as to unlawful possession of a stolen motor vehicle, the court noted that, in its discretion, it would simply enter a conviction and close that count, reducing the five-year sentence to no time and defendant would not be resentenced thereon. The court denied defendant's motion to reconsider the sentence. Defendant appeals.

¶ 31                            II. ANALYSIS

¶ 32    On appeal, defendant raises two overarching arguments. First, he contends that a new sentencing hearing before a different judge is required because the court fundamentally misapprehended the principles articulated by *Miller*, as evidenced by comments reflecting a misunderstanding of juvenile brain development, its consideration of improper aggravating factors, and its failure to apply pertinent mitigating factors. Second, defendant argues that, given that the evidence of his accomplishments while incarcerated demonstrated not just rehabilitative potential, but actual rehabilitation, a 41-year sentence for an offense committed when he was 16 years old, based on an accountability theory, is excessive.

¶ 33    Generally, we review for an abuse of discretion a trial court's sentencing decision. See, *e.g.*, *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). However, when the issue is whether a sentencing court misapprehended applicable law or misapplied sentencing factors, our review is

*de novo*.  See, *e.g.*, *People v. Moore*, 207 Ill. 2d 68, 75 (2003); *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26.

¶ 34                              A.  Misapplication of *Miller* Factors

¶ 35     Defendant argues first that the trial court misunderstood *Miller*'s findings on juvenile brain development, applied improper aggravating factors, and did not apply relevant mitigating factors. Defendant concedes that he did not receive a *de facto* life sentence and that he is not raising a constitutional challenge.  Rather, he contends that the court misapplied aggravating and mitigating factors as related to juvenile sentencing and did so in a manner reflecting a misunderstanding of the principles behind them.  Defendant's specific contentions of error will be explored individually below, but, in sum, he argues that the court's errors were pervasive, such that we cannot determine that the weight the trial court placed upon the improper factors was insignificant, particularly where the comments were not merely dismissive, and he received a sentence 15 years over the minimum**.**

¶ 36     Preliminarily, however, defendant concedes that he did not raise these arguments in his motion to reconsider the sentence.  He nevertheless requests that we review them for plain error, because the court's consideration of improper factors: (1) threatened to tip the scales of justice against him, in light of the plethora of mitigating evidence he presented; and (2) deprived him of a fair sentencing hearing.  Defendant argues that we should remand the case for resentencing before a different judge.

¶ 37     Under the plain-error doctrine, we may review an unpreserved error where: (1) a clear or obvious error occurred and the evidence is so closely balanced that, regardless of the seriousness of the error, it alone threatened to tip the scales of justice against the defendant (prong one); or (2) a clear or obvious error occurred and, regardless of the closeness of the evidence, the error is so

serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process (prong two). See *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); see also *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010) (explaining that, in the sentencing context, to demonstrate plain error, a defendant must show either: (1) the evidence at the sentencing hearing was closely balanced; or (2) the error was so egregious as to deny the defendant a fair sentencing hearing). Under both prongs of plain-error review, the defendant bears the burden of persuasion and, if he or she fails to meet that burden, we honor the procedural default. See *Merriweather*, 2022 IL App (4th) 210498, ¶ 25. However, we must begin any plain-error analysis by determining whether error occurred. *Id.*

¶ 38                                    1. Juvenile Brain Development

¶ 39    First, defendant contends that the court misunderstood and contradicted the principles enunciated in *Miller* concerning juvenile brain development where, despite claiming that it agreed that juveniles do not have the mental capacity of adults, it commented that: (1) defendant knew what a gun was and what it could do; (2) a juvenile mind knows right from wrong; and (3) had he been the original sentencing judge, he would have imposed a greater sentence. Defendant notes that the applicable question for sentencing purposes was not whether he knew what a gun could do, but, rather, whether at age 16 he understood the consequences of his decisions and engaged in long-term thinking. Indeed, defendant notes, had he not understood what a gun could do, he could not have been held accountable for the offense. In addition, defendant argues, the question was also not whether he knew right from wrong, but, rather, whether he had sufficient neurological development to think through the long-term consequences of his actions. Again, defendant notes, if he had not understood right from wrong, he could not have been found guilty of criminal conduct. Moreover, he asserts, the judge's comments that, had he been the initial sentencing judge,

he likely would have imposed a sentence *greater* than the sentence originally imposed, which was vacated, reflects the judge lacked the appropriate mindset or recognition that juvenile brain development advised *against* that originally imposed *de facto* life sentence. We conclude that there was no error.

¶ 40 In its broadest terms, *Miller* (and its progeny) established that, before sentencing a juvenile to the equivalent of life without parole, a sentencing court must first consider the juvenile offender's youth and certain attendant characteristics. See, *e.g.*, *Miller*, 567 U.S. at 489. Defendant here concedes that he did not receive a life sentence, but he still remains subject to the juvenile sentencing parameters that our General Assembly enacted in response to *Miller*. For example, because defendant was a juvenile when he committed these crimes, section 5-4.5-105 of the Code, which requires the court to consider specific "*additional* factors in mitigation" (emphasis added) before sentencing a juvenile, applies. 730 ILCS 5/5-4.5-105 (West 2016). Those factors include:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 41　The plain language of the statute clarifies that these are *additional* mitigating factors, meaning they supplement the general statutory mitigating and aggravating factors found in sections 5-5-3.1 and 5-5-3.2 of the Code (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020)). See, *e.g.*, *People v. Reyes*, 2023 IL App (2d) 210423, ¶ 41; *Merriweather*, 2022 IL App (4th) 210498, ¶ 31. To determine whether the trial court based its sentence on proper aggravating and mitigating factors, we must consider the record as a whole, rather than focusing on a few words or statements made by the court. *Merriweather*, 2022 IL App (4th) 210498, ¶ 31.

¶ 42　With that framework in mind, we find no error in the court's comments that defendant knew what a gun could do, a juvenile mind knows right from wrong, and that it would have initially imposed a more severe sentence. Preliminarily, we note that defendant does not tie these comments to the misapplication of any specific section 5-4.5-105(a) sentencing factor, but argues more generally that the court's comments reflect a misunderstanding of the relevant sentencing concepts. Viewing the record as a whole, we disagree. The court was clearly cognizant of the fact that the case was before it for resentencing due to defendant's age at the time of the offense and in light of the caselaw that developed subsequent to defendant's initial sentencing. It heard

arguments from counsel about the factors, and it also announced that it had considered the section 5-4.5-105 factors, as applied to defendant's case. The challenged comments, therefore, in greater context, reflect that the court fully understood that a juvenile mind is different from that of an adult, but simply that it found certain circumstances in this case tempered against the mitigating nature of defendant's juvenile status. The court reasonably considered the fact that, having himself been on the receiving end of such treatment, defendant, even if a juvenile at the time of the offense, had more reason to know the impact that shooting another person would have and that doing so was wrong. In our view, the court's comments do not reflect it considered defendant's knowledge of a gun and understanding of right from wrong to the *exclusion* of all authority reflecting there exist differences between a juvenile and adult mind. Indeed, the court had reviewed an academic paper on that very topic, it read Dr. Garbarino's evaluation and report concerning defendant, and it expressly stated it agreed that juveniles are different from adults. Further, its comments that it would have initially sentenced defendant to more time simply reflected what it would have done at the time, but, of course, not what it would do now, as it was more fully informed by the evolving authority in juvenile sentencing and the rationale for those changes, as evidenced by the sentence it actually imposed. In sum, we find no error and, thus, no plain error. *Merriweather*, 2022 IL App (4th) 210498, ¶ 25.

¶ 43                    2. Deterrence as Aggravating Factor

¶ 44    Defendant's second argument is that the court, by adopting Judge Sheldon's findings from the original sentencing hearing relating to aggravation and mitigation, also adopted Judge Sheldon's application of deterrence as an aggravating factor. In addition, the court further emphasized deterrence, where it discussed that gang members need to realize that they will most likely end up in jail or dead and the message needs to get out to people of all ages. Defendant notes

that courts have recognized that deterrence in a juvenile-sentencing context does not necessarily apply, as the same recklessness, impetuosity, and immaturity that render juveniles less culpable than adults also make them less likely to consider potential punishment or, thus, be deterred. Finally, defendant contends that, even if deterrence applies in some juvenile-sentencing cases, the way in which the court here applied it cannot withstand scrutiny because it focused on hypotheticals, such as "by the time they're 30, their life is over," and that the message needed to reach people who are ages 10 and 30 and 40, when juveniles simply are not thinking about what will happen when they are 30 years old, and a person at age 10 does not think the same way as a person at age 40. To apply deterrence to both groups, defendant contends, ignores the relevant scientific approach underlying *Miller*. We disagree and find no error.

¶ 45     This court recently addressed and rejected a similar argument in *Reyes*, 2023 IL App (2d) 210423, ¶¶ 40-41. There, we explained that section 5-4.5-105 simply provides *additional* mitigating factors to consider when sentencing a juvenile, but it does not eliminate the requirement that the court consider the general aggravating factors, including deterrence, found in section 5-5-3.2 of the Code. *Id.* ¶ 41. Further, in a footnote, we recognized that an aggravating factor such as deterrence should perhaps receive less weight when the offender is a juvenile, and that some courts have vacated sentences for juvenile offenders where the sentencing courts relied heavily on the need for deterrence. *Id.* ¶ 41, n.1. However, we noted that the defendant was not raising an argument about the constitutionality of the juvenile sentencing scheme, and, where he simply argued that the court should not have considered deterrence when sentencing a juvenile like himself, his argument failed, as the court was simply obliged to follow the law as written. *Id.*

¶ 46     Here, like the defendant in *Reyes*, defendant is not raising an argument concerning the constitutionality of the juvenile sentencing scheme. Rather, he is arguing that the court should not

have considered deterrence, because, essentially, juveniles are not likely to be deterred. We disagree. Again, even if true, the trial court here was applying the directive of the sentencing statutes. Nor is this case similar to those where the courts were found to have placed excessive weight on juvenile deterrence. See *e.g.*, *People v. Hill*, 2022 IL App (1st) 171739-B, ¶¶ 38-39; *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 89; *People v. Haynie*, 2020 IL App (1st) 172511, ¶ 35. Indeed, the court's comments reflected a need to deter persons of *all* ages from gang membership. Its comments pertained broadly to persons beyond the juvenile population, essentially correctly applying section 5-5-3.2 of the Code. In sum, we find no error in the court's application of deterrence as an aggravating factor and, thus, no plain error. *Merriweather*, 2022 IL App (4th) 210498, ¶ 25.

¶ 47                              3. Childhood as Aggravating Factor

¶ 48     Third, defendant asserts that the court considered his difficult childhood as an aggravating factor. For example, the court commented that, based upon his background, defendant knew what a gun was and what it could do, which implies that the offense would not have been as serious if defendant had grown up in a less crime-ridden neighborhood. Further, when discussing the fact that defendant was shot when he was seven years old, the court commented that he therefore knew what it was like to be shot, as well as the trauma that follows, consequently implying that a person who has *not* been shot would be less blameworthy and, in essence, using his childhood trauma as another reason why he should not have participated in the offense and, ultimately, in aggravation. Finally, when discussing defendant's uncle's murder, the court stated that defendant knew what it was like to lose someone and, despite impetuosity, defendant knew he was taking away a loved one from somebody else. Defendant argues that, besides off-handedly dismissing the research on juvenile brain development, this reflects that the court again used his childhood suffering as an

aggravating factor. Based on the court's reasoning, defendant contends, the crime would have been less serious if defendant's uncle had not been murdered. Collectively, defendant argues that the court's comments are inconsistent with section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2020)), which require the court to consider *in mitigation* a juvenile defendant's history of childhood trauma. He argues that the court violated the statute, because incidents like being shot at a very young age and an uncle being murdered down the street from his house illustrate his limited control over his environment and his inability to remove himself from crime producing settings, factors *Miller* held were mitigating, not aggravating. Defendant urges us to follow the reasoning of the courts in *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 88, and *People v. Royer*, 2020 IL App (3d) 170794, ¶ 29, which found error where the sentencing courts considered peer pressure and family environment as aggravating, instead of mitigating, evidence. We conclude that there was no error, but, if there was, it does not rise to plain error.

¶ 49     As we noted in our analysis of defendant's initial argument, when we read the record as a whole, we do not agree that the court considered defendant's childhood traumas in *aggravation*, so much as it found them less mitigating than they might otherwise have been, given the circumstances of the offenses. In other words, the mitigating weight the court afforded defendant's past experiences was within its discretion, and, when certain elements of those traumatic experiences mirrored the actions defendant later took, it was not unreasonable for it to find the mitigating weight of those points neutralized. Defendant's cited cases are distinguishable. In *McKinley*, the court expressed that it would not consider evidence of peer pressure as mitigating, referring to it as an "irrelevant factor," in direct contradiction with section 5-4.5-105(a)(2). *McKinley*, 2020 IL App (1st) 191907, ¶¶ 87-88. Similarly, in *Royer*, the court discussed as

aggravating circumstances the violent, angry home environment in which the defendant grew up, in direct contradiction with section 5-4.5-105(a)(3). *Royer*, 2020 IL App (3d) 170794, ¶ 29.

¶ 50    Further, even if there was error, it does not rise to plain error, because the evidence at the sentencing hearing pertaining to the applicability of the firearm enhancement was not closely balanced, nor was the error so egregious as to deny defendant a fair sentencing hearing. See *Hillier*, 237 Ill. 2d at 544-45. Specifically, the court considered all factors in mitigation and, in doing so, imposed the minimum sentence on the underlying offenses for both first-degree murder, attempt murder, and, essentially, possession of a stolen motor vehicle. These sentences reflect a significant reduction in defendant's sentence from that originally imposed, particularly in that the court declined to add to the first-degree murder sentence the originally imposed 15-year firearm enhancement, reduced the underlying attempt-murder conviction from 10 years to the minimum 6, and reduced the original 5-year sentence on the possession charge to only a straight conviction. As such, the *only* element of defendant's sentence left to challenge is the court's decision to impose the 15-year firearm enhancement as part of the attempt-murder sentence, which, we note, is also served at 85 percent (as opposed to 100 percent, if it had been added on to the first-degree murder conviction) (see, *e.g.*, 730 ILCS 5/3-6-3(a)(2)(i), (ii) (West 2020)).[3]    Accordingly, when we

---

[3]We recognize that, regardless of its components, the attempt-murder sentence is one overall sentence (see, *e.g.*, *People v. Vatamaniuc*, 2023 IL App (2d) 210665-U, ¶ 43). But this does not alter our conclusion. First, and as discussed more later in this decision, it remains that the sentence *was* reduced from 25 years to 21 years, and the court did so in recognition of the evidence of defendant's rehabilitation. Second, and as relevant here, the court's exercise of discretion to start at 6 years, instead of 10, but to again incorporate the enhancement, resulted in

consider the court's decision and expressed rationale for imposing the enhancement, it clearly had nothing to do with its views on defendant's childhood trauma. Rather, it imposed the enhancement because the offense was committed with a gun and it found that the legislature created the add-on because it wished to avoid people dying from guns, as they are used "Too easy. Too quick. People don't think." In sum, we find no error, but, if error, no plain error.

¶ 51                    4. Failure to Consider Mitigating Factors

¶ 52    Fourth, defendant argues that the trial court erred when, by adopting Judge Sheldon's findings regarding applicable aggravating and mitigating factors (and where Judge Sheldon had found no factors in mitigation "worthy of comment"), it failed to consider two applicable statutory mitigating factors, namely that the evidence demonstrated his: (1) criminal conduct was the result of circumstances unlikely to recur; and (2) character and attitude indicate that he is unlikely to commit another crime. See 730 ILCS 5/5-5-3.1(a)(8), (9) (West 2020). He notes that Dr. Gabarino opined that defendant was well-positioned to transition from prison to success in the outside world. Further, while in prison, he maintained employment and was accepted to Northwestern University; he notes that recidivism rates for prisoners who receive bachelor's degrees while incarcerated are 5%, rendering it 95% likely that he will not commit another offense. Indeed, defendant notes, he is no longer a gang member, which was a driving force behind his offenses. Moreover, during his almost 14 years of incarceration, he had received only three infraction tickets, none of them violent, and, when he was stabbed by his cellmate, he did not retaliate. As none of this evidence was

---

the minimum sentence for "attempt murder with a firearm enhancement." Our issue, therefore, concerns the court's decision to apply the enhancement at all, which we conclude was based not on any improper factor, but rather its consideration of the enhancement's purpose.

presented at the original sentencing hearing, since it had not yet occurred, defendant argues that Judge Tegeler should not have simply adopted Judge Sheldon's findings in mitigation. He contends that the case should be remanded for resentencing with instructions to the judge to give due reflection to the relevant mitigating factors.

¶ 53    For reasons similar to those described in the foregoing section, we find no error or, if error, no plain error. Preliminarily, as defendant alludes to in his request that we remand with instructions that the judge give due reflection to the relevant mitigating factors, this argument more resembles a suggestion that the court gave improper weight to the mitigating factors, as opposed to a failure to consider mitigating factors. While it is true that, without discussion, the court adopted Judge Sheldon's analysis of the general mitigating factors, and Judge Sheldon had found none worth mentioning, it is clear that the court here considered the evidence in mitigation that had developed *since* defendant's initial sentence. Indeed, defendant's arguments as to the relevance of the factors that his criminal conduct was the result of circumstances unlikely to recur and that his character and attitude indicate that he is unlikely to commit another crime all depend on evidence that developed and was received after Judge Sheldon's initial sentence, *all of which* the court reviewed and considered here. Thus, while the court did not *expressly* address the two mitigating factors defendant identifies, we presume it implicitly considered them, as well as the evidence that supported their applicability. See *e.g.*, *People v. Walker*, 2021 IL App (4th) 190073, ¶¶ 73-74 (the trial court must consider statutory factors in mitigation, but need not recite each factor it has considered; further, "there is a presumption the trial court considered any mitigating evidence before it").

¶ 54    In any event, any error here does not rise to plain error. Again, defendant's mitigating evidence resulted in the bulk of his sentence being reduced, with the sole exception being the

court's decision to impose one firearm enhancement. Its expressed rationale for doing so concerned the enhancement's applicability and legislative intent, as opposed to reflecting a failure to give due weight to mitigating factors. Accordingly, the alleged error here did not implicate a sentencing component with closely-balanced evidence, nor was the error so egregious as to deny defendant a fair sentencing hearing. See *Hillier*, 237 Ill. 2d at 544-45.

¶ 55                                      5. Consideration of the Victim's Status

¶ 56    Defendant lastly argues that the court improperly considered and emphasized the victim's status and drew a personal connection to it. Specifically, he notes that Rodriguez's mother, in her victim-impact statement, recounted that he had loved to play soccer and had dreamed of future opportunities to play soccer, including in California. Judge Tegeler commented:

> "Oscar had a lot of potential, as I understand. I've read the letters. Oscar played a sport that I love dearly. I played throughout high school and college. I was fortunate to play soccer until I got too old. I got to get old. I'll be upfront, I was a good soccer player but I was never invited to go out to California and play at the age of 15. Many of us get to get old and the retirement is forced on us to play games because our body doesn't let us do it anymore. Oscar didn't get that chance."

¶ 57    Defendant contends that, while the judge could consider victim-impact statements, his use of the evidence was improper because personal traits of a victim are not relevant to the question of the proper sentence to impose. For example, whether the victim was a "good man" or a soccer player does not render a defendant's crime more serious than it otherwise would have been. Here, the fact that the victim was a soccer player was not necessary to understand the seriousness of the crime or any other proper sentencing factor. Defendant argues that, if the victim had played a different sport or no sport at all, the offense would not be any less serious. "Making the error all

the worse was the fact that, in his sentencing comments, Judge Tegeler spent a full paragraph on Rodriguez's soccer career, but never once mentioned that [defendant] had been admitted into Northwestern." In addition, the fact that Rodriguez played the same sport that the Judge played in high school and college did not make the offense more serious, yet Judge Tegeler emphasized the personal connection and brought his own life experience into the sentencing decision. Overall, defendant contends, the judge exhibited a victim-centric focus during sentencing, to the exclusion of the *Miller* factors. And, most troubling, he notes, was the Judge's comment that, when defendant was shot at age seven, he lived, "unfortunately for [Rodriguez] because if [defendant] sitting here hadn't given his brother the gun, Mr. [Rodriguez] may be alive." Defendant notes that, in addition to the callous thought that it might have been better if he had died at age seven, the comment reflected a mindset looking at the incident exclusively from the victim's perspective, rather than focusing on his trauma of being shot as a child.

¶ 58    We agree that the court's extensive victim-centric comments were error. "Personal traits of victims are not relevant to the question of guilt or innocence *or to the question of the proper sentence to be imposed*." (Emphasis added.) *People v. Walker*, 109 Ill. 2d 484, 505 (1985). As defendant notes, this court has also explained that personal traits of a victim may be relevant if necessary to understanding the seriousness of the crime or another sentencing factor, but it is *not* appropriate if the court considers the personal traits in and of themselves. See *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 17 (where the trial judge considered that the victim was a World War II veteran and a "very good man," we concluded the reasoning was improper because it suggested that, because the victim was a "very good man," the defendant's crime was more serious than it otherwise would have been). We further explained that, while it is entirely appropriate for the court to consider the victim-impact statements, the evidence may not be used to make or imply

comparative judgments, such as that the defendant's crime was more serious and worthy of punishment because of the victim's status. *Id.* ¶ 19.

¶ 59    Here, the court did not merely consider the victim-impact statements. It emphasized the specific personal traits about Rodriguez described in those statements, detailing Rodriguez's interests, talents, and personality, his loss of opportunity, and it connected them to its *own* interests and life experience, suggesting a more sympathetic victim and tragic crime than, perhaps, it might have been if the victim had lacked those traits. Further, we agree that the court's comments implying that it was unfortunate that defendant had lived when he was shot as a seven-year-old child crossed a line, essentially improperly comparing the relative value of defendant's life against Rodriguez's. We admonish the court that such comments have no place in sentencing.

¶ 60    Still, we cannot find the error rises to plain error. See *id.*, ¶¶ 15-16 (finding error and noting that, because the error was properly preserved, the defendant did *not* carry the burden of demonstrating prejudice, whereas such a showing would have to be made in a plain-error context). As previously noted, except for the decision to impose the firearm enhancement, the court gave defendant the minimum sentence on the underlying crimes. With respect to the court's decision to impose the enhancement, the error neither concerned closely-balanced evidence, nor denied defendant a fair sentencing hearing, as the court's imposition of the enhancement was based on the enhancement's straightforward applicability in light of legislative intent.

¶ 61                                6. Ineffective Assistance

¶ 62    Alternatively, defendant argues that his trial counsel's failure to preserve the foregoing arguments constituted ineffective assistance of counsel, because no sound strategic reason can explain the absence of these meritorious issues from the post-sentencing motion, and the failure to raise them was prejudicial, in that the errors were not insignificant and, even if the court would not

have ultimately reduced the sentence based upon them, including the issue in the post-sentencing motion would have preserved it for our review. We disagree.

¶ 63    It is well-established that, to establish a claim of ineffective assistance of counsel, a defendant must establish both that counsel's representation fell below an objective standard of reasonableness *and* that counsel's actions resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, even if we were to presume unreasonable assistance, defendant cannot demonstrate prejudice necessary to succeed on his claim. "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). As explained above, the forfeited arguments were either not meritorious because there was no error or, even where we found error, those errors were not prejudicial because they did not implicate the sole discretionary decision the court made which increased the sentence here to one above the absolute statutory minimum, *i.e.*, the decision to impose the enhancement and the rationale therefore. Counsel cannot be deemed ineffective for failing to raise issues that are not meritorious. *Id.*

¶ 64                                    B. Excessive Sentence

¶ 65    Next, defendant argues that the 41-year sentence, and, specifically, Judge Tegeler's decision to apply the firearm add-on, constitutes an abuse of discretion. He points to the mitigating evidence that collectively reflects not only rehabilitative potential, but rehabilitation *realized*, including his: difficult childhood; education at Northwestern University; behavior as a "model prisoner" and rehabilitative activities (beyond his studies) while incarcerated; expressed remorse; and supportive family. Again, defendant clarifies that, since he will serve around 38 years in custody, his 41-year sentence is not *de facto* life and, therefore, he is not raising a constitutional argument. See, *e.g.*, *Dorsey*, 2021 IL 123010, ¶ 65. However, he argues that the sentence was

excessive and that it was near the maximum permissible sentence that he could have received, given Judge Tegeler's finding that he was not permanently incorrigible.[4]  Indeed, given the wealth of mitigating evidence, defendant argues that Judge Tegeler's rationale for imposing a 41-year sentence is unconvincing and, while he made general references to defendant's rehabilitative potential, he simply disregarded the *extent* of the demonstrated rehabilitation and did not afford it adequate weight, instead turning his attention to the victim's personal characteristics and asserting that defendant must pay his debt for what he did.  In particular, defendant contends that the court erred in applying the firearm enhancement to the attempt-murder conviction.  Defendant notes that, by choosing to apply the enhancement, the court reduced the attempt-murder sentence only four years (from 25 years to 21 years), such that it remains excessive, given the mitigating evidence.  Doing so by expressing its belief that this case would not have occurred if defendant had not handed his brother the gun was inaccurate, defendant contends, because the firearm at issue did not belong to defendant but was a "nation" gun stored at another gang member's apartment.  He contends that, even if he had stayed home that day, it is very possible another gang member could have taken the gun and the offense would have happened in essentially the same

---

[4]We disagree, because a finding of permanent incorrigibility (to the extent that it remains required in light of *Jones v. Mississippi*, ___ U.S. ___, 141 S. Ct. 1307, 1311 (2021) (sentencing court is not required to make a finding of permanent incorrigibility, even when imposing life without parole)), is triggered only when a *de facto* life sentence without parole is imposed.  See *People v. Holman*, 2017 IL 120655, ¶ 46.  Here, the court noted that, even if it sentenced defendant to more than 40 years, his parole eligibility removed the requirement that it find permanent incorrigibility.

way. In sum, given that the enhancement is discretionary for minors, defendant argues that the court should not have applied it here. He asks that, pursuant to our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1964), we vacate the firearm add-on, reducing his sentence to the minimum,

> "A 16-year-old who grew up in extremely difficult circumstances that led him into gang life, did not fire the gun, and has repeatedly demonstrated rehabilitation is not the type of person to whom [  ] a discretionary firearm add-on should be applied. [Defendant] is simply not a person whom taxpayers need to pay to incarcerate for nearly four decades. Instead, he has repeatedly demonstrated the ability to be a productive member of society."

¶ 66    We disagree. As previously noted, we will not disturb a defendant's sentence absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* at 212 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Absent evidence to the contrary, a sentencing court is presumed to consider the mitigating evidence presented, may determine the weight to give it, and is not required to expressly indicate its consideration of all mitigating factors and the weight it assigned to each. See, *e.g.*, *Walker*, 2021 IL App (4th) 190073, ¶¶ 73-74.

¶ 67    Here, as previously noted, defendant received the minimum sentence *except* for the court's imposition of a 15-year firearm enhancement. As the State notes, the firearm enhancements are structured to punish varying levels of gun-violence culpability, with the 15-year enhancement being the shortest. See 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006) (15 years); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006) (20 years); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006) (25 years). Nevertheless, defendant asserts that the court's decision to impose the relevant 15-year

enhancement was an abuse of discretion because it resulted from a failure to give adequate weight to the wealth of mitigating evidence he presented regarding rehabilitation. We disagree. While the court could have spent more time recounting that evidence, it expressly acknowledged defendant's laudable efforts while incarcerated, that he is not beyond rehabilitation, and explained that, given the evidence of defendant's efforts and rehabilitation, it was exercising its discretion to: (1) keep the first-degree murder sentence at the minimum 20 years; (2) not impose the 15-year firearm enhancement that had originally accompanied the first-degree murder conviction (where it would have been served at 100 percent); (3) reduce the originally-imposed 10-year sentence for attempt murder to the minimum 6 years; and (4) enter only a conviction, not a new sentence, for possession of a stolen motor vehicle. As such, not only did the court consider defendant's voluminous evidence of rehabilitation, it *applied* it to the new sentence. In fact, in our view, the court's comment that it would have originally imposed upon defendant a sentence *greater* than the one rendered by Judge Sheldon, but its ultimate imposition of a sentence *lower* than the one originally imposed, demonstrates how far it moved in response to the mitigating evidence. Moreover, it was not obliged to catalog or further elaborate on all of defendant's rehabilitative progress, given that its actions reflect its consideration of mitigation and its exercise of discretion to significantly reduce defendant's sentence.

¶ 68    Further, while the court expressed that defendant needed to be held responsible for his actions, it simply did not apply the firearm enhancement on the attempt murder because it failed to adequately consider mitigating evidence. Rather, it considered the purpose and applicability of the enhancement and determined it appropriately applied, given that a firearm was used by defendant, or one for whom he was accountable, in these crimes. The court correctly assessed and

applied the legislature's intent in enacting firearm enhancements. In fact, the legislature codified its intent, explaining:

"(a) Legislative findings. The legislature finds and declares the following:

(1) The use of a dangerous weapon in the commission of a felony offense poses a much greater threat to the public health, safety, and general welfare, than when a weapon is not used in the commission of the offense.

(2) Further, the use of a firearm greatly facilitates the commission of a criminal offense because of the more lethal nature of a firearm and the greater perceived threat produced in those confronted by a person wielding a firearm. Unlike other dangerous weapons such as knives and clubs, the use of a firearm in the commission of a criminal felony offense significantly escalates the threat and the potential for bodily harm, and the greater range of the firearm increases the potential for harm to more persons. Not only are the victims and bystanders at greater risk when a firearm is used, but also the law enforcement officers whose duty is to confront and apprehend the armed suspect.

(3) Current law does contain offenses involving the use or discharge of a gun toward or against a person, such as aggravated battery with a firearm, aggravated discharge of a firearm, and reckless discharge of a firearm; however, the General Assembly has legislated greater penalties for the commission of a felony while in possession of a firearm because it deems such acts as more serious.

(b) Legislative intent.

(1) In order to deter the use of firearms in the commission of a felony offense, the General Assembly deems it appropriate for a greater penalty to be imposed when a firearm

is used or discharged in the commission of an offense than the penalty imposed for using other types of weapons and for the penalty to increase on more serious offenses.

(2) With the additional elements of the discharge of a firearm and great bodily harm inflicted by a firearm being added to armed violence and other serious felony offenses, it is the intent of the General Assembly to punish those elements more severely during commission of a felony offense than when those elements stand alone as the act of the offender." 720 ILCS 5/33A-1 (West 2000).

Accordingly, we cannot find the court's imposition of the enhancement was greatly at variance with the spirit and purpose of the law, when its assessment of the purpose of the enhancement is perfectly *consistent* with the law's expressed spirit and purpose. See *Alexander*, 239 Ill. 2d at 212.

¶ 69    In addition, we disagree with defendant's characterization of his involvement as not critical to the events at issue and his suggestion that, since the gun used was a "nation gun," had he not been present, the crimes easily could have happened anyway. First, the trial evidence demonstrated that defendant personally possessed the weapon in the apartment prior to the events at issue and that he showed it off and brought it with him when the group decided to hunt rival gang members. So, while the nation gun may have been available to any gang member, it was this defendant who chose to contribute the weapon to the group's activities that night. Further, once in the vehicle and after "false flagging" Rodriguez, defendant twice handed the weapon to the vehicle's occupants to enable a shooting. Second, that the crimes theoretically could have happened without defendant there is simply speculation.

¶ 70    Defendant points to cases finding juvenile resentencing terms excessive, given the sentencing courts' failures to give adequate regard to overwhelming evidence of the defendants' rehabilitation. Those cases do not warrant another result here. To be sure, *McKinley*, 2020 IL App

(1st) 191907, is factually similar, in that the defendant there was also admitted to the Northwestern University program, received accolades from his professors, was a model inmate, and had demonstrated remorse. Indeed, at resentencing, the 16-year old defendant received a 39-year sentence, albeit (unlike here) *without parole*, for one count of first-degree murder, and the appellate court found the evidence of rehabilitation so overwhelming as to render the sentence excessive, particularly where the trial court only made brief, general references to it and did not afford it adequate weight. *Id.* ¶ 78. The First District concluded that the defendant was "the epitome of an offender who has been restored to useful citizenship" and reduced the sentence to 25 years. *Id.* ¶¶ 79, 91. However, unlike here, the alleged abuse of discretion in *McKinley* did not boil down *solely* to the imposition of an enhancement. Indeed, the court also did not reduce the sentence based only on the sentencing court's failure to consider evidence of rehabilitation, as it also found the court had not properly weighed multiple other factors, such as finding irrelevant the impact of peer pressure, giving improper weight to the need to deter future criminal conduct, and improperly considering the defendant's age as it applied to the offense. *Id.* ¶¶ 87-91.

¶ 71     Similarly, in two other cases upon which defendant relies, the court also found sentences excessive based on a failure to adequately consider evidence of rehabilitation, but, again, those cases did not concern the court's exercise of discretion to impose a firearm enhancement and the sentencing courts made other errors. See *People v. Bruce*, 2022 IL App (1st) 210811, ¶¶ 30-40 (trial court abused its discretion, where it rejected the parties' 23-year prison term agreement and instead sentenced the 16-year-old defendant to 28 years for two counts of first-degree murder; appellate court noted that it was "paramount" that the defendant was found guilty based on an accountability theory, was the youngest member of the group involved in the crime, was a model prisoner, and, in addition to the characteristics of youth, had a low IQ and mental illness; trial court

did not properly consider or give weight to the defendant's cognitive or developmental disability, his degree of participation in the offense, his demonstrated rehabilitation, his remorse, and his history of trauma); *People v. Hill*, 2022 IL App (1st) 171739-B, ¶¶ 45, 48-50 (the 15-year-old defendant was resentenced to concurrent 54-year terms for each of two murder counts and a consecutive 6-year term for attempt murder; court determined that the sentencing court failed to adequately consider extensive evidence connecting the defendant's youth to the offense and also improperly focused on deterrence).

¶ 72    In sum, we do not disagree that the evidence of defendant's rehabilitation is impressive. However, the trial court also took that into account and, based on defendant's behavior and evidence of rehabilitation, it reduced his sentences on the underlying crimes, but found appropriate one firearm enhancement. That decision was not an abuse of the court's discretion. We reject defendant's excessive-sentence argument and affirm.

¶ 73                        III. CONCLUSION

¶ 74    For the forgoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 75    Affirmed.